IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **GEORGE ALLEN MASON, JR.**, <br><br> Defendant. | Case No. 3:13-cr-00298-01-SI <br><br> **OPINION AND ORDER** |

S. Amanda Marshall, U.S. Attorney, and Pamala R. Holsinger, Assistant U.S. Attorney, District of Oregon, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204; Fara Gold, Trial Attorney, Criminal Section, U.S. Department of Justice, Civil Rights Division, 601 D Street, N.W., Washington, D.C. 20530. Attorneys for United States of America.

James F. Halley, James F. Halley, P.C., 735 S.W. First Avenue, 2nd Floor, Portland, OR 97204. Attorney for Defendant.

**Michael H. Simon, District Judge.**

A grand jury indicted Defendant George Allen Mason, Jr. ("Mason"), alleging that he "willfully caused bodily injury and, through the use of a dangerous weapon, attempted to cause bodily injury to D.B., who is gay, because of D.B.'s actual and perceived sexual orientation," in violation of the Hate Crimes Prevention Act, 18 U.S.C. § 249(a)(2). Dkt. 1. The indictment further alleges that Mason "employed a dangerous weapon that had traveled in interstate and

foreign commerce, to wit, the metal tool he used to strike D.B." and that the assault "occurred during the course of and as a result of travel in a motor vehicle, a channel, facility, or instrumentality of interstate or foreign commerce." *Id.* Mason has moved to suppress statements made by him and things seized from him (Dkt. 47) and to dismiss the charge against him as beyond the proper exercise of Congress' power under the Commerce Clause (Dkt. 48).[1] The Court held an evidentiary hearing on December 18, 2013. Based on the following findings of fact and conclusions of law, the Court DENIES Mason's motions to suppress and to dismiss (Dkts. 47 and 48).

## FINDINGS OF FACT

1. At approximately 3:30 p.m. on Friday, March 1, 2013, several Hillsboro Police Officers, including Officer James Weed, Officer Pete Allenbaugh, and Officer Jordan Schreiner, responded to a call regarding a possible assault that had just occurred near the intersection of 185th Avenue and Town Center Drive in Hillsboro, Oregon. The victim ("D.B.") and other witnesses on the scene reported the following: On March 1, 2013, D.B. and his boyfriend J.M. were walking their poodle, which was dyed pink. The two men were standing at a crosswalk on the corner of 185th Avenue and Town Center Drive, waiting to cross the street. Mason, accompanied by his wife Gardner, was driving a blue Land Rover. Mason made a left-hand turn through the intersection and, allegedly, yelled: "You fucking fags. You are un-American because your poodle is pink." D.B. and J.M. said nothing in reply and began to cross the street. Mason

---

[1] Mason also filed other motions, which are addressed separately by the Court in a Minute Order. In addition, the grand jury, in the same indictment, charged Mason's wife, Defendant Saraya Sophia Lisa Gardner ("Gardner"), with knowingly engaging in misleading conduct toward another person with intent to hinder, delay, and prevent the communication to a federal law enforcement officer of truthful information relating to the commission of a federal offense, in violation of 18 U.S.C. § 1512(b)(3). Dkt. 1. Gardner has filed numerous motions, and they are addressed by the Court in other documents.

then allegedly made a U-turn back toward D.B. and J.M., at which point D.B. pulled out his cell phone to call 9-1-1. D.B. held out his cell phone toward Mason to show Mason that D.B. was calling 9-1-1. Mason allegedly got out of his car, ran to D.B., and started punching him. D.B. backed away, but was hit by Mason on D.B.'s left shoulder. D.B. held up his arms to block additional punches and told Mason that he "hit like a girl."

2.  Mason went back to his car and retrieved what witnesses described as a metal tool with a red handle. Mason allegedly approached D.B. for a second time and began to hit D.B. with the tool in the back of D.B.'s head and on his forearm. Several witnesses in the area were in their cars and started honking their horns in an apparent effort to stop the attack. Mason allegedly ran back to his car and drove quickly away from the scene.

3.  D.B. and other witnesses described the attacker, later identified by witnesses as Mason following a photographic "lay down." The witnesses also described a passenger who looked "obese," sitting in the front seat of the car. Witnesses stated that the passenger never got out of the car but yelled "you fucking fags" from the window. The passenger was later identified as Gardner. One witness followed the blue Land Rover as it pulled away and recorded its license plate number. Law enforcement determined that the license plate number was registered to Mason, and several officers knew Mason as a transient who was known to camp with his wife Gardner in a blue Land Rover in the parking lot of the nearby Target store on Evergreen Parkway.

4.  Later in the evening on March 1, 2013, Officer Weed and Officer Allenbaugh returned to area where the alleged assault occurred to look for Mason. As the officers approached the Target store in the shopping complex near where the assault occurred, they noticed the blue Land Rover parked in the Target parking lot. The officers also observed a male matching

Mason's description walking in the parking lot. By the time the officers arrived in the parking lot, however, the male was gone. Officer Weed called for additional units to join him at the scene and waited to approach the vehicle. Several officers responded, including Officer Ryan Johnson, Officer Lindybeth Wilkin, Officer Alonzo Garcia, Officer Jordan Schreiner, Officer Mark Vertner, and Sergeant Debra Case. Officer Garcia was the first to arrive. Officer Weed and Officer Garcia approached the Land Rover in their vehicles and blocked it from leaving by parking their marked police vehicles both in front and in back of the Land Rover.

5. Officers Weed and Garcia approached the Land Rover. As he came closer to the car, Officer Weed recognized Gardner inside the Land Rover. The officers also noticed two dogs in the back of the Land Rover. Officer Weed identified himself to Gardner and began asking her questions. Officer Weed asked Gardner where Mason was, and Gardner told Officer Weed that Mason went into the Target store. Officer Weed next asked where Gardner was earlier in the day and whether she was with Mason. Gardner allegedly responded that she had not been in the Land Rover earlier that day. Officer Weed told Gardner that he had spoken to witnesses who identified Gardner as being in the Land Rover earlier in the day, to which Gardner allegedly responded, "Police always lie to me so why shouldn't I lie to you?"

6. Officer Weed advised Gardner that he just wanted to know the truth about what happened earlier in the day and that he wanted to hear both sides of the story. Gardner then allegedly told Officer Weed, "We told those guys we liked their dog, and they started flipping shit at us and flipped us off." When Officer Weed asked Gardner when the confrontation got physical, she responded, "That's a lie! Nothing got physical!" Officer Weed then told Gardner that several witnesses had seen the confrontation get physical. Gardner allegedly said, "I'm going to lie so my husband doesn't get arrested."

7. At this point, Officer Weed read Gardner her *Miranda* rights from a department issued resource guide.[2] Officer Weed asked Gardner if she understood her rights, and she responded "yeah."

8. While police officers were talking with Gardner in the parking lot of the Target store, Officer Ryan Johnson, who had arrived at the scene in response to Officer Weed's request for additional support, was attempting to locate Mason. Officer Johnson was performing an "area check" when he saw a person who seemed to match Mason's description near the Nordstrom Rack store. Officer Johnson rolled down the window of his police car and shouted at Mason. As Officer Johnson pulled his car over, Mason began to sprint away. Officer Johnson yelled at Mason to stop, but Mason continued to run. Although Officer Johnson lost sight of Mason, shortly after Officer Johnson drove out of the shopping complex in pursuit of Mason, he found Mason lying on the ground at the bottom of a steep, twenty-foot bank on the side of the road.

9. At approximately 12:14 a.m. on March 2, 2013, Officer Johnson handcuffed Mason and placed him under arrest. Because Mason complained of an injured leg, Officer Johnson called for medical assistance. While Officer Johnson and Mason were waiting for the medical team, Sergeant Case, Officer Schreiner, Officer Allenbaugh, and Officer Wilkin arrived at the scene. Officer Wilkin read Mason his *Miranda* rights from a prepared card, and Mason told the officers that he understood his rights.

10. Officer Schreiner told Mason that he was under arrest for assault and asked Mason if he owned a Land Rover. Mason responded that he did. Officer Schreiner then asked

---

[2] At the evidentiary hearing, Officer Weed brought a photocopy of the Department's resource guide and read the following *Miranda* warning into the record: "You have the right to remain silent. Anything you say may be used against you in a court of law. You have the right to talk to a lawyer and have him or her present with you while being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish." Officer Weed testified that he gave this precise warning to Gardner.

Mason where he was at approximately 3:30 p.m. on March 1, 2013. Mason said that he was in Portland on 82nd Avenue. Officer Schreiner told Mason that witnesses had identified Mason at the intersection of 185th Avenue and Town Center Drive in Hillsboro. At this point, Mason said, "I want a lawyer." The interrogation then stopped.

11.  A medical team arrived at 12:26 a.m. and left with Mason for the hospital at 12:34 a.m. Mason was given no medication en route and reported a pain level of "six out of ten." Upon arriving at the hospital, Mason was treated for a "pulled muscle in his leg."

12.  At approximately 12:28 a.m., before the medical team transported Mason to the hospital, Sergeant Case instructed Officer Weed to attempt to obtain consent from Gardner to search the Land Rover. In the absence of consent, the police discussed among themselves their plan to impound the car and seek a search warrant. Sergeant Case was standing near Mason, and Officer Weed was in the parking lot of the Target store near Gardner, so the officers communicated over the radio and by cell phone. Mason appears to have overheard a portion of the conversation between Sergeant Case and Officer Weed, and Mason allegedly told Sergeant Case, "You can search for anything you are looking for."[3] Sergeant Case then told Officer Weed about Mason's consent, and Officer Weed advised Gardner. When Gardner stated that she did not believe that Mason had given consent for the search of the car, the officers put their cell phones on "speaker phone" and had Mason talk to Gardner. After this conversation, Gardner got out of the car with the two dogs and stood by a nearby curb. Officer Weed then searched the car. He found a set of red metal bolt-cutters in the back pocket behind the passenger seat. Because

---

[3] In his moving papers, Mason argues that the reason he gave consent to the search of his car was because the police said that they might have to shoot one of the dogs if consent was not obtained. Neither Mason nor Gardner testified at the evidentiary hearing, and there was no evidence presented that supports Mason's claim that a police officer threatened Mason's dogs.

these bolt-cutters appeared to match the description of the weapon allegedly used to assault D.B., Officer Weed placed the bolt-cutters on the ground to be photographed.

13. When Gardner saw the bolt-cutters, she asked the officers why they were photographing that tool. Officer Johnson and Sergeant Case, who had returned to the Land Rover after Mason left for the hospital, explained that the bolt-cutters matched the description of the weapon used to assault D.B. Gardner responded that the bolt-cutters were not what Mason used to strike D.B. When the officers asked what Mason used to strike D.B., Gardner said that Mason used a red and black "dog toy," which they had discarded near River Road. When the officers inquired further, Gardner told them that Mason actually used a "serpentine wrench." The officers asked where the wrench was located. Gardner said that they had discarded it by River Road, but she declined to show the officers precisely where.

14. Later in the evening, while Mason was being transported to the hospital by ambulance with Officer Wilkin, Mason started talking to the officer. Officer Wilkin reminded Mason that he had asked to have counsel present before speaking with the police. Mason told Officer Wilkin that he wanted to talk and that he did not understand why he was being arrested. Mason said that he had been in Portland the entire day and has witnesses to prove it. Officer Wilkin again reminded Mason that he had asked for a lawyer, but Mason continued to ask Officer Wilkin questions. Mason also asked what "assault" meant and other legal questions. Eventually, Mason said that he knew why he was going to prison, but he did not elaborate.

## CONCLUSIONS OF LAW

### A. Mason's Motion to Suppress Statements and Things Seized

Mason moves to suppress statements that he made and things seized from the search of his car. Mason argues first that he was coerced into consenting to the search of the car because police officers threatened to shoot Mason's dogs if the police did not receive consent to search.

PAGE 7 – OPINION AND ORDER

The Court finds to be credible the testimony of Officer Weed, Officer Johnson, Sergeant Case, Officer Wilkin, and Officer Schreiner that no officer ever threatened to harm any of Mason's dogs. Further, there is no evidence to the contrary. Therefore, Mason's motion to suppress things seized is DENIED.

Mason also argues that the statements he made after he invoked his right to counsel should be suppressed. The Government agrees that Mason invoked his right to counsel, but argues that Mason voluntarily re-initiated the questioning and waived his *Miranda* rights by asking Officer Wilkin questions while they were riding in the ambulance to the hospital.

In *Edwards v. Arizona*, the Supreme Court held that a suspect, having invoked the right to counsel, is not subject to further interrogation by police until counsel has been made available to the defendant unless the defendant himself re-initiates the further communication with the police. 451 U.S. 477, 484-85 (1981). In a later case, *Oregon v. Bradshaw*, the Supreme Court clarified what a defendant must do to re-initiate questioning with the police. 462 U.S. 1039, 1045-46 (1983). The Court held that routine statements, "such as a request for a drink of water or . . . to use a telephone" will not amount to re-initiation, but that questions or statements that "evince[] a willingness and a desire for a generalized discussion about the investigation" will amount to re-initiation and a waiver of *Miranda*. *Id.* (holding that the defendant's statement, "Well, what is going to happen to me now?" re-initiated questioning with the police for purposes of the *Edwards* rule).

Officer Wilkin credibly testified that Mason asked her why he was being arrested and that Mason said he had been in Portland all day and has witnesses to prove it. Officer Wilkin reminded Mason that he had asserted his right to counsel, but Mason continued to talk with her. Mason asked Officer Wilkin about what "assault" meant and other legal questions about the

charges. These questions, like the questions that the defendant asked in *Bradshaw*, evinced "a willingness and desire for a generalized discussion" about the crime. *See Bradshaw*, 462 U.S. at 1045-46. Therefore, Mason voluntarily re-initiated the questioning with police and thereby waived his rights under *Miranda*.

Mason also argued at oral argument that the severe pain he was experiencing in his leg made his *Miranda* waiver involuntary. A defendant can, however, voluntarily waive his *Miranda* rights even when he is in pain or on medication. *United States v. George*, 987 F.2d 1428, 1430 (9th Cir. 1993) (holding waiver voluntary when defendant was suffering from an apparent drug overdose in the emergency room); *see also United States v. Lewis*, 833 F.2d 1380, 1384-84 (9th Cir. 1987) (holding waiver voluntary when defendant was in pain from recent surgery and had recently received a general anesthetic). A court looks to the circumstances surrounding the questioning to determine whether a defendant's waiver was voluntary despite pain, including whether the defendant was coherent, whether the defendant gave responsive answers, and whether the defendant remembered details accurately. *Compare George*, 987 F.2d at 1431 (finding that the defendant voluntarily waived *Miranda* despite pain because he responded coherently to questions, gave responsive answers, and was not unconscious or incoherent during questioning), *with Mincey v. Arizona*, 437 U.S. 385, 398-402 (1978) (finding that a confession was not voluntary when the defendant was in the intensive care unit of a hospital with a tube in his mouth, only able to communicate by writing on pieces of paper, and coming in and out of consciousness).

In this case, Mason was experiencing pain in his leg. The officers who testified at the evidentiary hearing believed that Mason was in severe pain. Mason also expressed to the medical team in the ambulance that his pain was at a level of "six out of ten." Despite these facts, there is

no indication in the record that Mason's waiver of *Miranda* was involuntary. Mason was alert and responsive the entire time that he was with the police officers. He spoke coherently and seemed to remember details accurately. Moreover, he said that he understood his rights and wanted to talk with Officer Wilkins about the investigation. Therefore, the circumstances indicate that Mason's waiver was voluntary, notwithstanding his leg pain. For all of these reasons, Mason's motion to suppress his statements is DENIED.

**B. Motion to Dismiss the Charge as Beyond the Reach of the Commerce Clause**

Mason also moves to dismiss the charge against him (Count 1), arguing that the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act ("HCPA"), 18 U.S.C. § 249 (2009), is unconstitutional both facially and as applied. Mason argues that HCPA is beyond the scope of Congress' commerce power. The Government responds that the HCPA is constitutional under the Commerce Clause both facially and as applied in this case.

Article 1, Section 8, Clause 3 of the Constitution states that Congress shall have the power to "regulate commerce with foreign nations, and among the several states." U.S. Const. art. 1, § 8, cl. 3. In recent years, the Supreme Court has held that there are three categories that Congress can regulate under the Commerce Clause: channels of interstate commerce, instrumentalities of interstate commerce, and intrastate activity that substantially affects interstate commerce. *See United States v. Lopez*, 514 U.S. 549, 558-59 (1995). The Court looks to three factors to determine whether an activity substantially affects interstate commerce: first, whether the activity is economic or noneconomic; second, whether there is a jurisdictional element; and third, whether substantial congressional findings support the conclusion regarding the effect on interstate commerce. *See Gonzales v. Raich*, 545 U.S. 1, 16 (2005).

The Supreme Court's opinions in *United States v. Lopez* and *United States v. Morrison*, 529 U.S. 598 (2000), are particularly relevant to the facts of this case. In *Lopez*, the Court struck

PAGE 10 – OPINION AND ORDER

down the Gun-Free School Zones Act, which made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." *Lopez*, 514 U.S. at 551 (citing 18 U.S.C. § 922(q)(1)(A)). The Court held that the Gun-Free School Zones Act did not regulate channels or instrumentalities of interstate commerce and that the regulated activity did not have a substantial effect on interstate commerce. *Lopez*, 514 U.S. 559-64. Specifically, the Court noted that § 922 did not contain a "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 561.

In *Morrison*, the Court addressed Congress' power to enact § 13981 of the Violence Against Women Act, which created a federal civil remedy to victims of gender violence. *United States v. Morrison*, 529 U.S. 598, 598 (2000). Section 13981, subsection (c) provided:

> A person . . . who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) of this section shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and other relief as a court may deem appropriate.

42 U.S.C. § 13981(c) (1994). The Court held that § 13981(c) was beyond the scope of Congress' power to regulated interstate and foreign commerce because, like the Gun-Free School Zones Act, it did not regulate the channels or instrumentalities of interstate commerce and the activity did not have a substantial effect on interstate commerce. *Morrison*, 529 U.S. at 626-27. Again, the Court emphasized that the statute at issue had no "jurisdictional element." *Id.* at 613. Additionally, the Court noted that congressional findings in the Violence Against Women Act concluded that gender-motivated violence had a serious impact on interstate commerce. *Id.* at 614. These findings, however, were not enough, according to the Supreme Court, to demonstrate a substantial effect on interstate commerce because the issue of "whether particular

PAGE 11 – OPINION AND ORDER

operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than legislative question, and can be settled finally only by this Court." *Id.* (citation and quotation marks omitted).

Mason argues that the HCPA exceeds the proper exercise of Congress' power under the Commerce Clause because, like the Violence Against Women Act struck down in *Morrison* and the Gun-Free School Zones Act struck down in *Lopez*, the HCPA regulates a non-economic activity that does not have a substantial effect on interstate commerce. The Government responds that the HCPA is constitutionally valid because unlike the statutes in *Morrison* and *Lopez*, the HCPA expressly contains a "jurisdictional element."

Section 249(a)(2)(A) of Title 18 makes unlawful under the HCPA willfully causing bodily injury to any person or, through the use of a dangerous weapon, attempting to cause bodily injury to any person, because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person, provided that such conduct occurs "in any circumstance described in subparagraph (B) or paragraph (3)."[4] Subparagraph (B), Section 249(a)(2)(B), is known as the "jurisdictional element" of this statute, and it provides:

> For purposes of subparagraph (A) [concerning offenses because of actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability], the circumstances described in this subparagraph are that—
>
> > (i) the conduct described in subparagraph (A) occurs during the course of, or as the result of, the travel of the defendant or the victim—
> >
> > > (I) across a State line or national border; or

---

[4] Paragraph (3) is inapplicable to the facts of this case.

PAGE 12 – OPINION AND ORDER

> > > (II) using a channel, facility, or instrumentality of interstate or foreign commerce;
>
> > (ii) *the defendant uses a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct described in subparagraph (A)*;
>
> > (iii) *in connection with the conduct in subparagraph (A), the defendant employs a firearm, dangerous weapon, explosive or incendiary device, or other weapon that has traveled in interstate or foreign commerce*; or
>
> > (iv) the conduct described in subparagraph (A)—
>
> > > (I) interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct; or
>
> > > (II) otherwise affects interstate or foreign commerce.

18 U.S.C. § 249(a)(2)(B) (emphasis added). The Government argues that this "jurisdictional element" keeps the HCPA within the constitutional scope of Congress' power under the Commerce Clause.

The Government's argument is primarily supported by the decision of the Ninth Circuit in *United States v. Alderman*, 565 F.3d 641 (9th Cir. 2009), which is binding precedent for this District Court. In that case, the Ninth Circuit considered the constitutionality of a federal statute that prohibited felons from possessing body armor that traveled in interstate commerce. *Id.* at 642-43. In *Alderman*, the Ninth Circuit held that, although the body armor statute did not fit naturally into one of the three *Lopez* categories (channels, instrumentalities, or economic activity with substantial effect on interstate commerce), the statute was still within Congress' power under the Commerce Clause because of the "express jurisdictional condition" required by the statute. *Id.* at 647. In other words, the statute only regulated body armor that was actually sold or offered for sale in interstate or foreign commerce. *Id.* at 647-48. In upholding the statute, the

Ninth Circuit relied on the Supreme Court's analysis in a 1977 case, *Scarborough v. United States*, 431 U.S. 563, 577 (1977), which was not overruled by the Supreme Court in either *Morrison* or *Lopez*.

The Supreme Court found in *Scarborough* that a statute regulating illegally possessed firearms that had previously traveled in interstate commerce had a sufficient nexus between the firearm and interstate commerce to satisfy the Constitution. 431 U.S. at 577. The body armor statute in *Alderman* had a jurisdictional condition that was essentially identical to the jurisdictional condition in the statute upheld in *Scarborough*. Thus, the Ninth Circuit concluded in *Alderman* that body armor sold in interstate commerce can be regulated by Congress consistent with the Commerce Clause. *Alderman*, 565 F.3d at 648.

The *Alderman* court, however, noted the inconsistency between the recent Supreme Court Commerce Clause cases and the still-binding *Scarborough* case from 1977. *Id.* at 648. For example, the Supreme Court's decision in *Lopez* and *Morrison* indicate that a jurisdictional condition standing alone cannot necessarily save an otherwise unconstitutional statute, *see Morrison*, 529 U.S. at 612-13 (noting that a jurisdictional element "*may* establish that the enactment is in pursuance of Congress' regulation of interstate commerce" or it might "lend support" to this conclusion) (emphasis added), whereas the *Scarborough* case seems to indicate that a jurisdictional condition will always save an otherwise infirm statute, *Scarborough*, 431 U.S. at 570. Nonetheless, the Ninth Circuit noted that "[a]ny doctrinal inconsistencies between *Scarborough* and the Supreme Court's more recent decisions are not for this Court to remedy." *Alderman*, 565 F.3d at 648 (citation and quotation marks omitted).

This Court is bound by existing Ninth Circuit and Supreme Court precedent. As such, the jurisdictional element of the HCPA, which is significantly similar to the jurisdictional elements

approved in both *Alderman* and *Scarborough*, is sufficient to satisfy the requirements of the Commerce Clause. Therefore, Mason's Motion to Dismiss because the HCPA is facially unconstitutional is DENIED.

In addition to arguing that the HCPA is unconstitutional on its face, Mason argues that the statute is unconstitutional as applied because there is no evidence that the weapon used in the attack traveled in interstate commerce. The Government responds that the "serpentine belt tool" used in the assault was manufactured in China and used in both Washington and Oregon. Moreover, the Government argues, the issue of whether or not that weapon traveled in interstate or foreign commerce is a factual question for the jury to decide. Although it might be unconstitutional to apply the HCPA to Mason if the weapon he used had not traveled in interstate or foreign commerce, or if he had not used any weapon at all, the factual determination of whether or not the weapon actually traveled in interstate or foreign commerce is for the jury. *See United States v. Dorsey*, 418 F.3d 1038, 1046 (9th Cir. 2005); *United States v. Mullet*, 868 F. Supp. 2d 618, 623 (N.D. Ohio 2012). Therefore, Mason's Motion to Dismiss on the grounds that the HCPA is unconstitutional as applied to him in this case is DENIED.[5]

---

[5] At oral argument, the Government argued that it should be allowed to satisfy the jurisdictional element in this case by proving one of two things: (1) Mason used a weapon that traveled in interstate commerce; *or* (2) Mason used a car that traveled in interstate commerce. This issue is not properly before the Court, as neither side has made a motion regarding what jurisdictional element theories should go before the jury.

If the Government can prove that the weapon Mason allegedly used traveled in interstate or foreign commerce, the jurisdictional element will be satisfied. The Court notes, however, that there is reason to believe that, based on the facts of the case, Mason's "use" of the car "in connection" with the alleged assault might not be sufficient, by itself, to satisfy the jurisdictional element of the statute.

Section 249(a)(2)(B)(ii) of the HCPA provides: "the defendant *uses* a channel, facility, or instrumentality of interstate or foreign commerce *in connection* with the conduct described in subparagraph (A)." 18 U.S.C. § 249(a)(2)(B)(ii) (emphasis added). The Supreme Court narrowly construed the meaning of "use . . . in connection with" in a federal statute that provided a

## CONCLUSION

Mason's Motion to Suppress Statements and Things Seized (Dkt. 47) and Motion to Dismiss pursuant to the Commerce Clause (Dkt. 48) are **DENIED.**

**IT IS SO ORDERED**.

DATED this 6th day of January, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

---

sentence enhancement for the use of a gun in connection with the underlying crime. *Bailey v. United States*, 516 U.S. 137, 137-38 (1995) (discussing 18 U.S.C. § 924(c)). The Court held that the meaning of "use . . . in connection with" requires the government to provide "evidence sufficient to show an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." *Id.* at 143. Although Congress later amended 18 U.S.C. § 924(c) to add the word "possession," the Supreme Court's holding that "use," without the inclusion of the alternative of "possession," requires that the defendant use the firearm as "an operative factor" still stands. Because this issue is not squarely before the Court at this time, the Court does not reach this question.