# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:13-CR-00298-02-SI |
| v. | **OPINION AND ORDER** |
| **SARAYA SOPHIA LISA GARDNER**, | |
| Defendant. | |

S. Amanda Marshall, U.S. Attorney, and Pamala R. Holsinger, Assistant U.S. Attorney, District of Oregon, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204; Fara Gold, Trial Attorney, Criminal Section, U.S. Department of Justice, Civil Rights Division, 601 D Street, N.W., Washington, D.C. 20530. Attorneys for United States of America.

Thomas K. Coan, Attorney at Law, 1001 S.W. Fifth Avenue, Suite 1400, Portland, OR 97204. Attorney for Defendant.

**Michael H. Simon, District Judge.**

A grand jury indicted Saraya Sophia Lisa Gardner ("Gardner") and charged her under the

Victim and Witness Protection Act, 18 U.S.C. § 1512, for "knowingly engaging in misleading

conduct towards another person with intent to hinder, delay, and prevent the communication to a

federal law enforcement officer of truthful information relating to the commission of . . . a

federal offense." Dkt. 1. In the same indictment, the grand jury also charged Gardner's husband,

George Allen Mason Jr. ("Mason") under the Hate Crimes Prevention Act, 18 U.S.C.

§ 249(a)(2). *Id.* Gardner moves to dismiss Count 2 for failure to state a claim (Dkt. 37), to

dismiss the charges against her as beyond the proper exercise of Congress' power under the

Commerce Clause (Dkt. 38), to suppress statements (Dkt. 40), to dismiss Count 2 as

unconstitutional as applied (Dkt. 41), and to dismiss Count 2 as void for vagueness (Dkt. 43).

The Court held an evidentiary hearing on December 18, 2013. Based on the following findings

of fact and conclusions of law, the Court GRANTS IN PART AND DENIES IN PART

Gardner's motions (Dkts. 37, 38, 40, 41, and 43).

## FINDINGS OF FACT

1.       At approximately 3:30 p.m. on Friday, March 1, 2013, several Hillsboro Police

Officers, including Officer James Weed, Officer Pete Allenbaugh, and Officer Jordan Schreiner,

responded to a call regarding a possible assault that had just occurred near the intersection of

185th Avenue and Town Center Drive in Hillsboro, Oregon. The victim ("D.B.") and other

witnesses on the scene reported the following: On March 1, 2013, D.B. and his boyfriend J.M.

were walking their poodle, which was dyed pink. The two men were standing at a crosswalk on

the corner of 185th Avenue and Town Center Drive, waiting to cross the street. Mason,

accompanied by his wife Gardner, was driving a blue Land Rover. Mason made a left-hand turn

through the intersection and, allegedly, yelled: "You fucking fags. You are un-American because

your poodle is pink." D.B. and J.M. said nothing in reply and began to cross the street. Mason

then allegedly made a U-turn back toward D.B. and J.M., at which point D.B. pulled out his cell

phone to call 9-1-1. D.B. held out his cell phone toward Mason to show Mason that D.B. was

calling 9-1-1. Mason allegedly got out of his car, ran to D.B., and started punching him. D.B.

backed away, but was hit by Mason on D.B.'s left shoulder. D.B. held up his arms to block

additional punches and told Mason that he "hit like a girl."

2.        Mason went back to his car and retrieved what witnesses described as a metal tool with a red handle. Mason allegedly approached D.B. for a second time and began to hit D.B. with the tool in the back of D.B.'s head and on his forearm. Several witnesses in the area were in their cars and started honking their horns in an apparent effort to stop the attack. Mason allegedly ran back to his car and drove quickly away from the scene.

3.        D.B. and other witnesses described the attacker, later identified by witnesses as Mason following a photographic "lay down." The witnesses also described a passenger who looked "obese," sitting in the front seat of the car. Witnesses stated that the passenger never got out of the car but yelled "you fucking fags" from the window. The passenger was later identified as Gardner. One witness followed the blue Land Rover as it pulled away and recorded its license plate number. Law enforcement determined that the license plate number was registered to Mason, and several officers knew Mason as a transient who was known to camp with his wife Gardner in a blue Land Rover in the parking lot of the nearby Target store on Evergreen Parkway.

4.        Later in the evening on March 1, 2013, Officer Weed and Officer Allenbaugh returned to area where the alleged assault occurred to look for Mason. As the officers approached the Target store in the shopping complex near where the assault occurred, they noticed the blue Land Rover parked in the Target parking lot. The officers also observed a male matching Mason's description walking in the parking lot. By the time the officers arrived in the parking lot, however, the male was gone. Officer Weed called for additional units to join him at the scene and waited to approach the vehicle. Several officers responded, including Officer Ryan Johnson, Officer Lindybeth Wilkin, Officer Alonzo Garcia, Officer Jordan Schreiner, Officer Mark Vertner, and Sergeant Debra Case. Officer Garcia was the first to arrive. Officer Weed and

Officer Garcia approached the Land Rover in their vehicles and blocked it from leaving by parking their marked police vehicles both in front and in back of the Land Rover.

5.      Officers Weed and Garcia approached the Land Rover. As he came closer to the car, Officer Weed recognized Gardner inside the Land Rover. The officers also noticed two dogs in the back of the Land Rover. Officer Weed identified himself to Gardner and began asking her questions. Officer Weed asked Gardner where Mason was, and Gardner told Officer Weed that Mason went into the Target store. Officer Weed next asked where Gardner was earlier in the day and whether she was with Mason. Gardner allegedly responded that she had not been in the Land Rover earlier that day. Officer Weed told Gardner that he had spoken to witnesses who identified Gardner as being in the Land Rover earlier in the day, to which Gardner allegedly responded, "Police always lie to me so why shouldn't I lie to you?"

6.      Officer Weed advised Gardner that he just wanted to know the truth about what happened earlier in the day and that he wanted to hear both sides of the story. Gardner then allegedly told Officer Weed, "We told those guys we liked their dog, and they started flipping shit at us and flipped us off." When Officer Weed asked Gardner when the confrontation got physical, she responded, "That's a lie! Nothing got physical!" Officer Weed then told Gardner that several witnesses had seen the confrontation get physical. Gardner allegedly said, "I'm going to lie so my husband doesn't get arrested."

7.      At this point, Officer Weed read Gardner her *Miranda* rights from a department issued resource guide.[1] Officer Weed asked Gardner if she understood her rights, and she responded "yeah."

---

[1] At the evidentiary hearing, Officer Weed brought a photocopy of the Department's resource guide and read the following *Miranda* warning into the record: "You have the right to remain silent. Anything you say may be used against you in a court of law. You have the right to

8. While the police officers were talking with Gardner in the parking lot of the Target store, Officer Ryan Johnson, who had arrived at the scene in response to Officer Weed's request for additional support, was attempting to locate Mason. Officer Johnson was performing an "area check" when he saw a person who seemed to match Mason's description near the Nordstrom Rack store. Officer Johnson rolled down the window of his police car and shouted at Mason. As Officer Johnson pulled his car over, Mason began to sprint away. Officer Johnson yelled at Mason to stop, but Mason continued to run. Although Officer Johnson lost sight of Mason, shortly after Officer Johnson drove out of the shopping complex in pursuit of Mason, he found Mason lying on the ground at the bottom of a steep, twenty-foot bank on the side of the road.

9. At approximately 12:14 a.m. on March 2, 2013, Officer Johnson handcuffed Mason and placed him under arrest. Because Mason complained of an injured leg, Officer Johnson called for medical assistance. While Officer Johnson and Mason were waiting for the medical team, Sergeant Case, Officer Schreiner, Officer Allenbaugh, and Officer Wilkin arrived at the scene. Officer Wilkin read Mason his *Miranda* rights from a prepared card, and Mason told the officers that he understood his rights.

10. Officer Schreiner told Mason that he was under arrest for assault and asked Mason if he owned a Land Rover. Mason responded that he did. Officer Schreiner then asked Mason where he was at approximately 3:30 p.m. on March 1, 2013. Mason said that he was in Portland on 82nd Avenue. Officer Schreiner told Mason that witnesses had identified Mason at

talk to a lawyer and have him or her present with you while being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish." Officer Weed testified that he gave this precise warning to Gardner.

the intersection of 185th Avenue and Town Center Drive in Hillsboro. At this point, Mason said, "I want a lawyer." The interrogation then stopped.

11.     A medical team arrived at 12:26 a.m. and left with Mason for the hospital at 12:34 a.m. Mason was given no medication en route and reported a pain level of "six out of ten." Upon arriving at the hospital, Mason was treated for a "pulled muscle in his leg."

12.     At approximately 12:28 a.m., before the medical team transported Mason to the hospital, Sergeant Case instructed Officer Weed to attempt to obtain consent from Gardner to search the Land Rover. In the absence of consent, the police discussed among themselves their plan to impound the car and seek a search warrant. Sergeant Case was standing near Mason, and Officer Weed was in the parking lot of the Target store near Gardner, so the officers communicated over the radio and by cell phone. Mason appears to have overheard a portion of the conversation between Sergeant Case and Officer Weed, and Mason allegedly told Sergeant Case, "You can search for anything you are looking for."[2] Sergeant Case then told Officer Weed about Mason's consent, and Officer Weed advised Gardner. When Gardner  stated that she did not believe that Mason had given consent for the search of the car, the officers put their cell phones on "speaker phone" and had Mason talk to Gardner. After this conversation, Gardner got out of the car with the two dogs and stood by a nearby curb. Officer Weed then searched the car. He found a set of red metal bolt-cutters in the back pocket behind the passenger seat. Because these bolt-cutters appeared to match the description of the weapon allegedly used to assault D.B., Officer Weed placed the bolt-cutters on the ground to be photographed.

---

[2] In his moving papers, Mason argues that the reason he gave consent to the search of his car was because the police said that they might have to shoot one of the dogs if consent was not obtained. Neither Mason nor Gardner testified at the evidentiary hearing, and there was no evidence presented that supports Mason's claim that a police officer threatened Mason's dogs.

13.     When Gardner saw the bolt-cutters, she asked the officers why they were photographing that tool. Officer Johnson and Sergeant Case, who had returned to the Land Rover after Mason left for the hospital, explained that the bolt-cutters matched the description of the weapon used to assault D.B. Gardner responded that the bolt-cutters were not what Mason used to strike D.B. When the officers asked what Mason used to strike D.B., Gardner said that Mason used a red and black "dog toy," which they had discarded near River Road. When the officers inquired further, Gardner told them that Mason actually used a "serpentine wrench." The officers asked where the wrench was located. Gardner said that they had discarded it by River Road, but she declined to show the officers precisely where.

14.     Later in the evening, while Mason was being transported to the hospital by ambulance with Officer Wilkin, Mason started talking to the officer. Officer Wilkin reminded Mason that he had asked to have counsel present before speaking with the police. Mason told Officer Wilkin that he wanted to talk and that he did not understand why he was being arrested. Mason said that he had been in Portland the entire day and has witnesses to prove it. Officer Wilkin again reminded Mason that he had asked for a lawyer, but Mason continued to ask Officer Wilkin questions. Mason also asked what "assault" meant and other legal questions. Eventually, Mason said that he knew why he was going to prison, but he did not elaborate.

## CONCLUSIONS OF LAW

### A.  Motion to Dismiss—Failure to State a Claim

Gardner argues that 18 U.S.C § 1512(b)(3) of the Victim and Witness Protection Act ("VWPA") does not apply to a local police officer who is not a witness, victim, or informant. Section 1512(b)(3) of the VWPA prohibits individuals from engaging in "misleading conduct towards another person, with the intent to—hinder, delay or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission . . .

of a federal offense." 18 U.S.C. § 1512(b)(3) (1982). Gardner argues that the words "another person" refers only to a victim, witness, or informant, and does not mean "any person." Because "another person" refers only to victims, witnesses, and informants, Gardener argues, a local law enforcement officer investigating a crime does not meet the definition of "another person" under the VWPA.

"Statutory interpretation begins with the language of the statute." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1026 (9th Cir. 2013) (citation and quotation marks omitied). When terms within a statute are not defined, those terms must be "accorded their plain and ordinary meaning, which can be deduced through reference sources such as general usage dictionaries." *Id.* When determining the meaning of a statute, however, courts "look not only to the particular statutory language, but to the design of the statute as a whole." *Crandon v. United States*, 494 U.S. 152, 158 (1990). Nonetheless, "statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985).

Gardner argues that "another person" is ambiguous after looking to the plain meaning of that term and that principles of statutory construction support the interpretation that "another person" means only a victim, witness, or informant. The term "another person" is used in the statute five times and the term "any person" is used in the statue ten times. Gardner relies upon the canon of statutory interpretation that holds that the use of different terms in different parts of the statute, "demonstrates that Congress intended to convey a different meaning for those words." *S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003). Because Congress used "another person" in some instances and "any person" in other instances, Gardner argues, these terms must

mean different things and "another person" should not be interpreted to be synonymous with

"any person."

Gardner also relies upon the title of the statute as evidence of what "another person" was

intended to mean. The title of 18 U.S.C. § 1512 is "Tampering with a witness, victim or an

informant." Gardner argues that this title is helpful because it indicates who the statute was

intended to protect.

Gardner also refers to the congressional findings that accompany the VWPA. The stated

purposes of the VWPA are "to enhance and protect the necessary role of crime victims and

witnesses in the criminal justice process" and "to ensure that the Federal Government does all

that is possible within limits of available resources to assist victims and witnesses of crime

without infringing of the constitutional rights of the defendant." Victim and Witness Protection

Act of 1982, Pub. L. No. 97-291, 96 Stat. 1248, § 2 (1982). Gardner argues that these statements

of purpose demonstrate that the act was intended to protect only victims and witnesses, not law

enforcement officers.

Gardner further argues that the legislative history of the VWPA also supports a narrow

interpretation of "another person." The VWPA Senate Report states that "Section 1512 applies to

offenses against witnesses, victims or informants." Victim and Witness Protection Act of 1982,

S. Rep. No. 97-532, at 14 (1982). The report makes no mention of the VWPA applying to law

enforcement officers who are investigating a crime. Gardner argues that this failure to mention

law enforcement officers is consistent with the statutory scheme, because there is a different

federal law that prohibits individuals from giving false information to law enforcement officers

in the course of an investigation. *See, e.g.*, 18 U.S.C. § 1001.

Gardner's final argument is that the "rule of lenity" mandates that the statute be interpreted narrowly. The rule of lenity "requires courts to limit the reach of criminal statutes to the clear import of their text and construe any ambiguity against the government." *United States v. Romm*, 455 F.3d 990, 1001 (9th Cir. 2006). The rule of lenity, however, applies only as a last resort, when a court has applied all other aids of statutory interpretation and is still left with an ambiguous statute. *United States v. Nadar*, 542 F.3d 713, 721 (9th Cir. 2008).

The Government responds that the plain meaning of "another person" is sufficient to include police officers, and therefore, there is no reason to delve further into statutory interpretation and legislative history. Webster's Third New International Dictionary defines "another" as, "different or distinct from the one first named or considered." Webster's Third New International Dictionary 89 (3d ed. 2002). The Government argues that based on this definition, a police officer clearly fits within the plain meaning of the term "another person."

In *United States v. Veal*, 153 F.3d 1233 (11th Cir. 1998), the Eleventh Circuit analyzed the meaning of "another person" in the VWPA, and its analysis supports the Government's contention. In *Veal*, police officers who conspired to kill a drug dealer after learning that he had a contract out to kill one of the officers lied to local investigators about the circumstances of the drug dealer's death. *Id.* at 1236-38. The police officers were charged with a civil rights crime and witness tampering. *Id.* at 1238. The *Veal* court found that "the plain language of the statute" clearly expressed that "another person" means "any person." *Id.* at 1245. Several district courts have followed the holding in *Veal*, finding that the "another person" text of § 1512(b)(3) of the VWPA includes police officers. *See United States v. Cotton*, No. 06-cr-20084, 2006 WL 2927675, at *2 (E.D. Mich. Oct. 12, 2006); *United States v. Smith*, No. 00-cr-785-1, 2001 WL 1568851, at *5 (N.D. Ill. Dec. 10, 2001).

Although the legislative purpose and title of the VWPA may support an argument that 18 U.S.C. § 1512(b)(3) applies only to victims, witnesses, and informants, the plain text of the statute is unambiguous. Therefore, the Court looks no further than the plain meaning of the text. *See Park 'N Fly*, 469 U.S. at 194. Because a local police officer fits within the plain meaning of the term "another person," Gardner's motion to dismiss for failure to state a claim is DENIED.[3]

## B. Motion to Dismiss—Commerce Clause

Gardner moves to dismiss Count 2 of the indictment. Gardner is accused of misleading local police officers about a federal crime, and she argues that the statute underlying this federal crime, the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act ("HCPA"), 18 U.S.C. § 249 (2009), is unconstitutional because it is beyond the scope of Congress' Commerce Clause power. Gardner argues that if the underlying statute is constitutionally invalid, the witness tampering charge against her must be dismissed because it is dependent on Gardner misleading an officer about a federal offense that is unconstitutional.

Article 1, Section 8, Clause 3 of the Constitution states that Congress shall have the power to "regulate commerce with foreign nations, and among the several states." U.S. Const. art. 1 § 8, cl. 3. In recent years, the Supreme Court has held that there are three categories that Congress can regulate under the Commerce Clause: channels of interstate commerce, instrumentalities of interstate commerce, and intrastate activity that substantially affects interstate commerce. *See United States v. Lopez*, 514 U.S. 549, 558-59 (1995). The Court looks to three factors to determine whether an activity substantially affects interstate commerce: first,

---

[3] At oral argument, Gardner also argued that Count 2 should be dismissed because Gardner did not lie to the police officers about the "commission" of a federal crime but merely about Mason's whereabouts. The facts alleged in the indictment do not support this argument. Gardner allegedly mislead police officers about the assault itself as well as about Mason's location. For example, Gardner gave the police officers misleading and inconsistent answers regarding the weapon used in the assault and its whereabouts.

whether the activity is economic or noneconomic; second, whether there is a jurisdictional element; and third, whether substantial congressional findings support the conclusion regarding the effect on interstate commerce. *See Gonzales v. Raich*, 545 U.S. 1, 16 (2005).

The Supreme Court's opinions in *United States v. Lopez* and *United States v. Morrison*, 592 U.S. 598 (2000), are particularly relevant to the facts of this case. In *Lopez*, the Court struck down the Gun-Free School Zones Act, which made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." *Lopez*, 514 U.S. at 551 (citing 18 U.S.C. § 922(q)(1)(A)). The Court held that the Gun-Free School Zones Act did not regulate channels or instrumentalities of interstate commerce and that the regulated activity did not have a substantial effect on interstate commerce. *Lopez*, 514 U.S. 559-64. Specifically, the Court noted that § 922 did not contain a "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 561.

In *Morrison*, the Court addressed Congress' power to enact § 13981 of the Violence Against Women Act of 1994, which created a federal civil remedy to victims of gender violence. *United States v. Morrison*, 529 U.S. 598, 598 (2000). Section 13981, subsection (c) provided:

> A person . . . who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) of this section shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and other relief as a court may deem appropriate.

42 U.S.C. § 13981(c) (1994). The Court held that § 13981(c) was beyond the scope of Congress' power to regulate interstate and foreign commerce because, like the Gun-Free School Zones Act, it did not regulate the channels or instrumentalities of interstate commerce and the activity did not have a substantial effect on interstate commerce. *Morrison*, 529 U.S. at 626-27. Again, the

Court emphasized that the statute at issue had no "jurisdictional element." *Id.* at 613. Additionally, the Court noted that congressional findings in the Violence Against Women Act concluded that gender-motivated violence seriously impacts interstate commerce. *Id.* at 614. These findings, however, were not enough, according to the Supreme Court, to demonstrate a substantial effect on interstate commerce because the issue of "whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than legislative question, and can be settled finally only by this Court." *Id.* (citation and quotation marks omitted).

Gardner argues that the HCPA exceeds the proper exercise of Congress' power under the Commerce Clause because, like the Violence Against Women Act struck down in *Morrison*, and the Gun-Free School Zones Act struck down in *Lopez*, the HCPA regulates a non-economic activity that does not have a substantial effect on interstate commerce. The Government responds that the HCPA is constitutionally valid because unlike the statutes in *Morrison* and *Lopez*, the HCPA expressly contains a "jurisdictional element."

Section 249(a)(2)(A) of Title 18 makes unlawful under the HCPA willfully causing bodily injury to any person or, through the use of a dangerous weapon, attempting to cause bodily injury to any person, because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person, provided that such conduct occurs "in any circumstance described in subparagraph (B) or paragraph (3)."[4] Subparagraph (B), Section 249(a)(2)(B), is known as the "jurisdictional element" of this statute, and it provides:

> For purposes of subparagraph (A) [concerning offenses because of actual or perceived religion, national origin, gender, sexual

---

[4] Paragraph (3) is inapplicable to the facts of this case.

orientation, gender identity, or disability], the circumstances described in this subparagraph are that—

> (i) the conduct described in subparagraph (A) occurs during the course of, or as the result of, the travel of the defendant or the victim—

>> (I) across a State line or national border; or

>> (II) using a channel, facility, or instrumentality of interstate or foreign commerce;

> (ii) *the defendant uses a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct described in subparagraph (A)*;

> (iii) *in connection with the conduct in subparagraph (A), the defendant employs a firearm, dangerous weapon, explosive or incendiary device, or other weapon that has traveled in interstate or foreign commerce*; or

> (iv) the conduct described in subparagraph (A)—

>> (I) interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct; or

>> (II) otherwise affects interstate or foreign commerce.

18 U.S.C. § 249(a)(2)(B) (emphasis added). The Government argues that this "jurisdictional element" keeps the HCPA within the constitutional scope of Congress' power under the Commerce Clause.

The Government's argument is supported by the decision of the Ninth Circuit in *United States v. Alderman*, 565 F.3d 641 (9th Cir. 2009), which is binding precedent for this District Court. In that case, the Ninth Circuit considered the constitutionality of a federal statute that prohibited felons from possessing body armor that traveled in interstate commerce. *Id.* at 642-43. In *Alderman*, the Ninth Circuit held that, although the body armor statute did not fit naturally into one of the three *Lopez* categories (channels, instrumentalities, or economic activity with

substantial effect on interstate commerce), the statute was still within Congress' power under the Commerce Clause because of the "express jurisdictional condition" required by the statute. *Id.* at 647. In other words, the statute only regulated body armor that was actually sold or offered for sale in interstate or foreign commerce. *Id*. at 647-48. In upholding the statute, the Ninth Circuit relied on the Supreme Court's analysis in a 1977 case, *Scarborough v. United States*, 431 U.S. 563, 577 (1977), which was not overruled by the Supreme Court in either *Morrison* or *Lopez*.

The Supreme Court found in *Scarborough* that a statute regulating illegally possessed firearms that had previously traveled in interstate commerce had a sufficient nexus between the firearm and interstate commerce to satisfy the Constitution. *Id.* The body armor statute had an essentially identical jurisdictional condition as the *Scarborough* condition. Thus, the Ninth Circuit concluded in *Alderman* that body armor sold in interstate commerce can be regulated by Congress consistent with the Commerce Clause. *Alderman*, 565 F.3d at 648.

The *Alderman* court, however, noted the inconsistency between the recent Supreme Court Commerce Clause cases and the still-binding *Scarborough* case from 1977. *Id.* at 648. For example, the Supreme Court's decision in *Lopez* and *Morrison* indicate that a jurisdictional condition standing alone cannot necessarily save an otherwise unconstitutional statute, *see Morrison*, 529 U.S. at 612-13 (noting that a jurisdictional element "*may* establish that the enactment is in pursuance of Congress' regulation of interstate commerce," or it might "lend support" to this conclusion) (emphasis added), whereas the *Scarborough* case seems to indicate that a jurisdictional condition will always save an otherwise infirm statute. *Scarborough*, 431 U.S. at 570. Nonetheless, the Ninth Circuit noted that "[a]ny doctrinal inconsistencies between *Scarborough* and the Supreme Court's more recent decisions are not for this Court to remedy." *Alderman*, 565 F.3d at 648 (citation and quotation marks omitted).

This Court is bound by existing Ninth Circuit and Supreme Court precedent. As such, the jurisdictional element of the HCPA, which is significantly similar to the jurisdictional elements approved in both *Alderman* and *Scarborough*, is sufficient to satisfy the requirements of the Commerce Clause. Therefore, Gardner's Motion to Dismiss because the HCPA is facially unconstitutional is DENIED.

## C. Motion to Suppress Statements

Gardner moves for an order suppressing the statements she made to police officers on March 1, 2013, arguing that the statements were not voluntary and were given in violation of Gardner's *Miranda* rights. Gardner's motion raises three issues: (1) whether Gardner was in custody and whether Gardner was interrogated when police asked her questions in her car; (2) whether Gardner knowingly and intelligently waived her *Miranda* rights; and (3) whether Gardner's statements are subject to the exclusionary rule because the statements form the basis of the crime charged.

### 1. Custody and Interrogation

Gardner argues that her *Miranda* rights were triggered when the police officers parked their vehicles both in front of and behind Gardner's car, preventing Gardner from leaving, before asking her questions about Mason's whereabouts. Gardner asserts that under these circumstances, the "custody" and "interrogation" requirements of *Miranda* were satisfied, and the police officers were required to give Gardner her *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). The Government concedes that Gardner was in custody when the police officers parked in front of and behind Gardner's car because Gardner was not free to leave. The Government argues, however, that Gardner's *Miranda* rights were not triggered because there was no interrogation.

The *Miranda* safeguards apply when a person is both in custody and subject to interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Interrogation under *Miranda* is "express questioning or its functional equivalent." *Id.* at 309 (citation and quotation marks omitted). In other words, the term "interrogation" includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* The Government argues that because the police were only asking Gardner questions about Mason, the questions were not likely to elicit an incriminating response.

The evidence presented at the evidentiary hearing does not support the assertion that the police questioning was not likely to elicit an incriminating response. The Government acknowledges that Officer Weed testified that he asked Gardner what she knew about what happened earlier in the day and told her that witnesses had placed her in the car with Mason. This line of questioning could reasonably be expected to elicit an incriminating response, particularly considering that a passenger in a car could be involved in criminal activity as an accomplice. Moreover, the officers knew when they were questioning Gardner that witnesses had reported that Gardner herself yelled anti-gay comments out of the window of the car. These facts demonstrate that the express questioning by the officers was likely to elicit an incriminating response. Therefore, Gardner was both in custody and interrogated. Accordingly, her *Miranda* rights were triggered at the beginning of the police encounter.

## 2. Waiver

The Government argues that Gardner was given a *Miranda* warning about 15 minutes after the police started questioning Gardner and that she waived her *Miranda* rights. Gardner reports that she does not recall receiving any *Miranda* warnings and argues that even if she did, she did not knowingly and intelligently waive her rights. Gardner argues that she did not have

enough information regarding how her statements could potentially incriminate her to waive her *Miranda* rights knowlingly.

The Government bears the burden of proving by a preponderance of the evidence that Gardner knowingly, intelligently, and voluntarily waived her *Miranda* rights. *See Missouri v. Seibert*, 542 U.S. 600, 609 n.1 (2004). The Court must assess the voluntariness of an admission under the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Mickey v. Ayers*, 606 F.3d 1223, 1233 (9th Cir. 2010) (citation and quotation marks omitted).

Officer Weed credibly testified at the evidentiary hearing that he read Gardner a *Miranda* warning from a department-issued resource guide. He further credibly testified that when he asked Gardner if she understood her rights, she responded, "yeah." There is no evidence that the police officer coerced Gardner or unduly pressured her to talk. Moreover, under Ninth Circuit law, Gardner did not have a right to be advised that the questioning might "provoke incriminating answers." *United States v. Lares-Valdez*, 939 F.2d 688, 690 (9th Cir. 1991). Thus, Gardner validly waived her *Miranda* rights.

### 3. Exclusionary Rule

The Government also argues that regardless of whether Gardner waived her *Miranda* rights, the exclusionary rule should not be applied to her statements because the exclusionary rule does not apply to false statements that are themselves a crime, even if those statements were obtained in violation of the Constitution. To support this argument, the Government invokes the principle that the Constitution does not afford a defendant the right to lie. *See Brogan v. United States*, 522 U.S. 398, 404-05 (1998).

The Ninth Circuit has addressed this issue in *United States v. Mitchell*. 812 F.2d 1250 (9th Cir. 1987), *overruled on other grounds by Planned Parenthood of Columbia/Willamette,*

*Inc., v. Am. Coalition of Life Activists*, 290 F.3d 1058 (9th Cir. 2002). In *Mitchell*, the defendant was illegally arrested at the Honolulu airport. During the time that he was illegally detained, the defendant threatened the President of the United States. *Id.* at 1252. The Ninth Circuit determined that "committing a crime is far different from making an inculpatory statement" and held that the exclusionary rule does not bar the prosecution of a crime when the statements themselves constitute the crime. *Id.* at 1253. *See also United States v. Melancon*¸ 662 F.3d 708, 712 (5th Cir. 2011) (finding that defendant's false statements underlying his charge under 18 U.S.C. § 1001 was admissible at trial even if obtained in violation of defendant's *Miranda* rights).

For the reasons discussed above, Gardner's statements made before she was given her *Miranda* warning should be suppressed with the exception of those statements that are themselves the operative basis of the crime charged. Therefore, Gardner's motion to suppress is GRANTED IN PART AND DENIED IN PART.

**D. Motion to Dismiss—Unconstitutional as Applied**

Gardner also argues that 18 U.S.C. § 1512(b)(3) is unconstitutional as applied because it violates her rights to free speech and due process. For Gardner's argument that 18 U.S.C. § 1512(b)(3) violates her rights under the First Amendment, she relies on *United States v. Alvarez*, 132 S. Ct. 2537 (2012), for the proposition that even false speech is protected speech. The Government argues that protected false "pure speech" is distinguishable from Gardner's speech lying to police officers, and therefore, Gardner's alleged lies are not protected by the First Amendment.

Gardner's speech falls into the historically regulated category of speech integral to criminal conduct. *See id.* at 2539. The statute that Gardner is charged under, 18 U.S.C. § 1512(b)(3), is similar to perjury statutes, which have been upheld under the First Amendment.

*See In re Michael*, 326 U.S. 224, 227-29 (1945). Therefore, 18 U.S.C. § 15125(b)(3) is not unconstitutional as applied to this case.

Gardner next argues that she was entitled under the Due Process Clause to personal notice of the potential consequences (up to 20 years in prison) of the acts prohibited by § 1512(b)(3). The Government responds that due process does not require that Gardner receive personal notice of potentially prohibited acts.

Gardner's argument that 18 U.S.C. § 1512(b)(3) violates due process is unavailing. The Fifth Amendment requires that a criminal statute "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Due process does not, however, require that each potential defendant receive personal notice of the prohibited acts. Moreover, ignorance of law is not an excuse for criminal conduct. *See United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 563 (1971). Because 18 U.S.C. § 1512(b)(3) provides fair and sufficient notice to the public as to the conduct that it prohibits, Gardner's due process rights have not been violated. Thus, Gardner's motion is DENIED.

## E. Motion to Dismiss—Void for Vagueness

Gardner also argues that the term "another person" in 18 U.S.C. § 1512(b) is unconstitutionally vague. For the reasons discussed in Gardner's Motion to Dismiss for Failure to State a Claim (Dkt. 37), the plain meaning of the term "another person" is not unconstitutionally vague. Courts interpreting 18 U.S.C. 1512(b)(3) have uniformly held that this statutory language is not facially vague. *See, e.g.*, *United States v. Tyler*, 281 F.3d 84 (3d Cir. 2002); *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996); *United States v. Kalevas*, 622 F. Supp. 1523, 1527-28 (S.D.N.Y. 1985). Gardner's motion is therefore DENIED.

**CONCLUSION**

Gardner's Motion to Dismiss for Failure to State a Claim (Dkt. 37), Motion to Dismiss Pursuant to the Commerce Clause (Dkt. 38), Motion to Dismiss as Unconstitutional as Applied (Dkt. 41), and Motion to Dismiss as Void for Vagueness (Dkt. 43) are **DENIED**. Gardner's Motion to Suppress Statements (Dkt. 40) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED**.

DATED this 6th day of January, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge